J-S06016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: D.I.T., A MINOR AND S.P.T., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.D.T., JR., FATHER | No. 1341 MDA 2015 |

Appeal from the Decree July 15, 2015
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2015-0069
2015-0070

BEFORE:   PANELLA, J., MUNDY, J., and STEVENS, P.J.E.*

MEMORANDUM BY MUNDY, J.:                              **FILED MARCH 02, 2016**

Appellant, T.D.T., Jr. (Father), appeals from the July 15, 2015 decrees involuntarily terminating his parental rights to his minor sons, D.I.T. and S.P.T., (collectively, the Children).[1]  After careful review, we affirm.

This appeal arises from the petitions for involuntary termination of parental rights filed by R.L.W. (Mother), and her husband, D.M.W. (Stepfather), on May 22, 2015.  Mother and Father are former spouses, and both of the Children were born during their marriage.  **See** Petitions for Involuntary Termination of Parental Rights, 5/22/2015, at 3.  By 2009, Mother and Father's relationship had become strained, and the parents were

---

[1] D.I.T. was born in November 2007, and S.P.T. was born in August 2009.

*Former Justice specially assigned to the Superior Court.

engaging in periods of "on and off separation." N.T., 7/14/2015, at 21. In December 2009, Father was charged with two counts of endangering the welfare of a child, after he was found to be severely intoxicated while caring for the Children. *Id.* at 6-7. Father pled guilty to these charges in 2010, and was sentenced to three years of probation. *Id.* at 7, 48. Father continued to spend time at Mother's residence until October 2010, when he was charged with sexually assaulting Mother. *Id.* at 7-8. As a result, Father entered a guilty plea to indecent assault. *Id.* at 8-9, 48. In addition, Mother obtained a protection from abuse (PFA) order against Father. *Id.* at 8. In November 2010, Father was charged with violating the PFA order by contacting Mother. *Id.* at 8-9. As a result of these events, Father was incarcerated until August 2011. *Id.* at 9.

During his incarceration, Father filed a *pro se* custody complaint. *Id.* at 9, 12, 43. At the conclusion of the parents' custody proceeding, by order dated January 26, 2012, Mother was awarded sole legal and physical custody of the Children.[2] *Id.* at 12. As discussed in greater detail *infra*, Father has not visited with the Children since November 2010, and the

---

[2] During the custody proceedings, Father was evaluated by psychologist Laurie S. Pittman, Ph.D. *See* Mother and Stepfather's Petition to Adopt, 7/6/15, at Exhibit 2. Dr. Pittman recommended that Father not have any contact with the Children until he is able to document six consecutive months of sobriety, and that Father should not have unsupervised contact with the Children until he completes two years of consistent psychotherapy. *Id.* at 10 (unpaginated).

parents have not participated in any subsequent custody proceedings. *Id.* at 15.

A termination hearing was held on July 14, 2015, during which the orphans' court heard the testimony of Mother; Stepfather; Father; and the Children's paternal grandmother, M.D. (Paternal Grandmother). The orphans' court also interviewed the Children. On July 15, 2015, the orphans' court entered its decrees, involuntarily terminating Father's parental rights to the Children. Father timely filed a notice of appeal on August 5, 2015, along with a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i).[3]

On appeal, Father raises the following issues for our review.

> 1. Whether the [orphans' court] erred in finding that [Father] evidenced a settled purpose of relinquishing parental rights and failed or refused to perform parental duties towards the Children for a period in excess of six months preceding the petition[?]
>
> 2. Whether the [orphans'] court erred in failing to consider Father's abilities and willingness to remedy any findings of past failures to perform parental duties[?]

---

[3] We note that it was improper for Father to file a single notice of appeal from both of the termination decrees. *See* Pa.R.A.P. 341, Note ("Where, however, one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."). However, we decline to quash Father's appeal, as we discern no prejudice stemming from Father's procedural misstep. *See, e.g.*, *id.* at 902 (stating, "[f]ailure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal[]").

3. Whether the [orphans'] court's finding that [Father] made no true effort to exercise his parental rights is against the weight of the evidence as [Father's] explanations must be considered in the determination to terminate rights[?]

4. Whether the [orphans'] court erred in finding that the best interest of the Children would be served by terminating [Father's] parental rights[?]

Father's Brief at 4 (unnecessary capitalization omitted).

We consider Father's claims, mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1) and (b), which provide as follows.

**§ 2511. Grounds for involuntary termination**

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

…

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical

> care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(1). To meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008), *citing* **In re Adoption of R.J.S.**, 901 A.2d 502, 510 (Pa. Super. 2006). The orphans' court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). **Id.,** *quoting* **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998).

This Court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." **In re B.,N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005), *quoting* **In re C.M.S.**, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004). Rather,

"[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). Incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012), *citing In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975). Further, "[w]e review the orphans' court's decision for abuse of discretion or error of law, and we must defer to the orphans' court's findings of fact if the record supports them. As we have already noted, termination of parental rights is appropriate only where clear and convincing evidence supports termination under § 2511(a)." *In re S.S.W.*, 125 A.3d 413, 416 (Pa. Super. 2015) (internal citation omitted).

In his first three issues, Father asserts the orphans' court erred in terminating his parental rights pursuant to Section 2511(a)(1). Specifically, Father argues that Mother created obstacles which prevented him from contacting the Children. Father's Brief at 15. Father contends, *inter alia*, that Mother did not respond to Father's attempts at communication, that Mother denied his requests to see the Children, that Father feared that Mother would file another PFA against him if he persisted in trying to contact her, and that Father lacked recent contact information for Mother. *Id.* at 10,

15-16. According to Father, he attempted to maintain a relationship with the Children by staying in contact with their maternal grandfather, who provided Father with updates on the Children's lives, and who provided the Children with gifts and financial support from Father. *Id.* at 15-16. Finally, Father insists that he has been attempting to "get his life together" before initiating a second custody action. *Id.* at 16-17.[4]

Here, the orphans' court provided the following reasoning as its basis for terminating Father's parental rights.

> Father apparently maintained a relationship with Maternal Grandfather and [the orphans' court] is confident that had he wanted to reach out and obtain visitation or file for visitation, he certainly could have done that. Father was not incarcerated in 2013 and 2014 and he could have certainly filed for visitation of the children again; he previously filed for custody *pro se* while incarcerated and was familiar with the process. Of course Father would still need to comply with the six months of sobriety recommended by Dr. Pittman in the previous custody action.
>
> Father would also need to comply with the Section 5329 threat of harm evaluation as stated in Judge Ness' custody order. Father presented no satisfactory explanation … as to why he couldn't have six months of sobriety in the last two and a half years and clearly that's an important factor when attempting to be a parent. Father has also failed to

---

[4] In his third issue Father concedes, "he admittedly failed in seeking or establishing physical custody of the Children, his failure to do so was based on a flawed understanding that he had to get his own life together … Father recognized that the Children were being properly cared for in []Mother's home and custody at the time." Father's Brief at 20.

undergo a threat of harm evaluation as previously ordered without any explanation. …

Father also failed to perform parental duties when he did not maintain sobriety in the last two and a half years. … Father testified that he has only inquired about the children in the last six months and has last seen the children about four years ago. Father's explanation for the lack of contact was the difficulty of reaching Mother via her cellphone and her insisting to have visits supervised by a professional. However, later testimony revealed that Father at one point knew Mother's cellphone number and that his uncle was able to contact Mother without any issue in regards to his grandfather's estate. Mother also testified that her number is listed in the White Pages. Father presented no evidence as to why he did not complete the Section 5329 evaluation so that supervised visits could be arranged as stated in the previous custody order.

….

Father's actions in the past couple of years indicate that he has continued to struggle with substance abuse issues and is still attempting to get his life together. ….

…. Father had the ability to demonstrate his parenting skills in 2013 and 2014 when he was not incarcerated and he failed to do so. In addition, Father's continuing struggle with substance abuse greatly inhibits his ability to parent and his failure to undergo the Section 5329 threat of harm evaluation prevents him from seeking supervised visitation[.] Judge Ness' custody order explicitly stated that the children would not be kept from Father so long as he maintains sobriety and complies with the required evaluations. In fact, supervised visitation with the children was previously suggested by Dr. Pittman so long as Father could document six months of continuous abstinence from controlled substances. Father has simply failed to comply with any of the

recommendations and presented no evidence to excuse his [non]compliance.

…. Father has not shown any serious attempts to parent the children aside from inquiring about them in the past two years. [] Father had a recent incident involving both alcohol and controlled substances that involved a period of incarceration and no documented progress that he has remained drug-free for at least six months in any recent years.

Orphans' Court Opinion, 9/18/2015, at 12-15.

After a thorough review of the record in this matter, we conclude that the orphans' court's findings are supported by the record. Therefore, the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to the Children. During the termination hearing, Mother testified that Father has had no direct contact with the Children since November 2010. N.T., 7/14/2015, at 15. Father has not requested contact with the Children since the parents' custody proceeding, which concluded in January of 2012. *Id.* at 12-15. Father's last direct contact with Mother was a letter that he sent to her in 2012 or 2013 after the PFA order expired. *Id.* at 30, 32. Mother conceded that she moved to a new address in April 2013, but Mother's current address is "listed in the white pages." *Id.* at 26, 31. Mother's phone number has remained the same. *Id.* at 26.

Mother acknowledged that Father has kept in touch with the Children's maternal grandfather, but she was not aware of Father asking the maternal grandfather to see the Children. *Id.* at 25. Mother stated that Father sent one or two birthday cards to the Children through their maternal grandfather

in 2012 or 2013. *Id.* at 15. Father sent gifts along with the birthday cards, and there also was "a monetary gift in Easter of 2014." *Id.* at 16. Father sent an approximately eighty dollar birthday gift for D.I.T. in October 2014. *Id.* Mother noted that Father has never paid child support. *Id.* at 16-17. Mother initiated a support action while Father was incarcerated in 2011, but later withdrew her request for support in July of 2013. *Id.* at 16-17.

Father testified that he sent twenty dollars per week to Mother and the Children after he was incarcerated. *Id.* 41-42. According to Father, this lasted "for a good five or six months." *Id.* at 49. Father stated that he stopped sending money because "I went to complete … a drug and alcohol program." *Id.* Father was incarcerated again from December 1, 2011, until December 25, 2012, due to a probation violation. *Id.* at 42, 48, 58. Father explained that he violated his probation because he found his "sex offender class" too disturbing and refused to attend. *Id.* at 42. Father also admitted to having failed a drug screen. *Id.* at 48.

Concerning his lack of recent communication with the Children, Father testified that he has contacted the Children's maternal grandfather. *Id.* at 45, 54. Father claimed that he did not contact Mother to arrange supervised visits with the Children after the PFA order expired because Mother "would never agree on … who would supervise the visitation. She wanted me to pay out-of-pocket to go through a third party … and I didn't have the finances at that point." *Id.* at 52. Father also stated that he did not know where

- 11 -

Mother was living, and that Mother's phone number has changed. *Id.* at 45-46. When asked what efforts he has made to locate Mother's address, Father replied, "in the last six months every time I ran -- wrote her or tried to call, she has never responded. Quite frankly, I didn't see that [*sic*] the purpose." *Id.* at 54. Father admitted that the last time he tried to call Mother was "a couple months" after he was released from incarceration, although Father failed to specify which period of incarceration he was referring to. *Id.* at 55. Father did not attempt to call Mother in the past six months. *Id.*

Father further testified that he has not filed any additional custody actions because he did not think he was "ready." *Id.* at 53. Father explained that he wanted to go back to school, have a place of his own, own a car, and have a stable job, so that he has "a better leg to stand on" when he presents his case to the court. *Id.* at 53-54. Father insisted that he has been "trying to get [his] life together," and that he has made efforts to maintain his sobriety. *Id.* at 44, 55. Father stated that he attended parenting classes and voluntarily participated in a counseling class called the "Freedom Program" while incarcerated. *Id.* at 44-45. Father also reported that he attended intensive outpatient treatment. *Id.* at 50. According to Father, he plans on seeing a psychiatrist and a counselor as part of additional drug and alcohol treatment. *Id.* at 52.

Despite these efforts, Father admitted that he recently was arrested due to a drug and alcohol related incident. *Id.* at 46-47. Father was incarcerated from April 30, 2015 until May 15, 2015. *Id.* at 58. Father insisted that this was an "isolated incident," which resulted from the fact that he was caring for his sick father and grandmother. *Id.* at 46-47. Father stated that he has been sober for three months. *Id.* at 47.

Paternal Grandmother testified that Mother ended all contact between the Children and Father's extended family soon after S.P.T's birth, when the charges were filed against Father. *Id.* at 59. Paternal Grandmother recalled that Father asked her to purchase Christmas gifts for the Children after he was incarcerated, and Paternal Grandmother complied. *Id.* at 60. However, Mother informed Paternal Grandmother that she could not deliver the presents in person, and instructed Paternal Grandmother to drop the presents off at the home of the Children's maternal grandfather. *Id.* Paternal Grandmother indicated that she lost track of Mother and the Children after they moved in August 2011, and that she has not seen the Children in about four years. *Id.* Paternal Grandmother stated that Father has "tried very hard" to keep in touch with the Children, and that he contacted the Children's maternal grandfather "constantly" while incarcerated. *Id.* at 61.

Herein, the record is replete with instances of Father's inability to maintain sobriety, to the detriment of the Children and any relationship with

- 13 -

them. It is also concerning that the initial incident, involved Father's substance abuse and the danger he posed to the Children. Accordingly, despite evidence of some effort on Father's part, the record confirms that Father has refused or failed to perform parental duties for a period of at least six months prior to filing of the termination petitions on May 22, 2015. Crucially, Father continues to be plagued by substance abuse issues, as evidenced by his recent arrest. Therefore, no relief is due.

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id**. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id**. at 63.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

Here, the orphans' court found that there is no significant bond between Father and the Children, due to their lack of recent contact.

- 14 -

Orphans' Court Opinion, 9/18/2015, at 16. As a result, terminating Father's parental rights would have a minimal impact on the Children. *Id.* The court also found that the Children are bonded with Stepfather, and that it would be in the best interests of the Children to be adopted by Stepfather. *Id.* at 16-17.

Father argues that terminating his parental rights would not be in the best interests of the Children, because Mother failed to permit or encourage the Children to have a relationship with him. Father's Brief at 22. Father also contends that terminating his parental rights will prevent the Children from having a relationship with Father's extended family. *Id.* at 23. According to Father, preserving his parental rights will have no impact on the relationship between Mother, Stepfather, and the Children, but Father's relationship with the Children will be "forever altered" if his parental rights are terminated. *Id.* Father insists that he is "ready, willing, and able to be a father to the Children…." *Id.*

We again conclude that the orphans' court did not abuse its discretion. As previously noted, the Children have not seen Father since November 2010. Mother testified that she met Stepfather in March 2011, and that they have resided together with the Children since August 2011. N.T., 7/14/2015, at 17-18. Mother stated that Stepfather cares for the Children in every way that a parent would, and that the Children treat Stepfather "for all practical purposes as their father. They refer to him as daddy." *Id.* at 18.

The Children look up to Stepfather and respect him, and Stepfather's extended family has accepted the Children and "treat them like their own."[5] *Id.* Concerning the Children's knowledge of Father, Mother stated that she provides the Children with birthday cards sent by Father. *Id.* at 28. Mother explained, "they do know about [Father] that he was their dad and they know … they have seen pictures of themselves with him when they were babies. But they don't ask a whole lot of questions." *Id.* Additionally, Alexis Sipe, Esquire, guardian *ad litem* for the Children, testified at the hearing that "it appears that the boys are very well settled and adjusted with the environment with [Mother and Stepfather] that they know and I feel from what I have seen that this would be good for them." *Id.* at 67. Thus, we conclude the record supports the orphans' court finding that it would best serve the Children's needs and welfare to terminate Father's parental rights.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to the Children. Accordingly, we affirm the orphans' court's July 15, 2015 decrees involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

---

[5] Stepfather agreed that he has a good relationship with the Children, and wants to adopt them. N.T., 7/14/2015, at 34-36.

Decrees affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/2/2016